# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

KAREN ANN OGARA                                                         PLAINTIFF


v.                                    NO. 3:14-cv-00212 PSH


CAROLYN W. COLVIN, Acting Commissioner                                  DEFENDANT
of the Social Security Administration


## MEMORANDUM OPINION AND ORDER


Plaintiff Karen Ann Ogara ("Ogara") commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Ogara maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Ogara first maintains that her back and leg impairments meet or equal Listings 1.02 and 1.04C, and the ALJ erred at step three of the sequential evaluation process when she failed to so find.

---

[1]

The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

At step three, the ALJ must determine whether a claimant's impairments, when considered individually and in combination, meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is a medical determination, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that her impairments meet or equal a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Listing 1.02 encompasses a major dysfunction of a joint and is characterized by, inter alia, the involvement of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively as defined in Listing 1.00B2b, or the involvement of one peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively as defined in Listing 1.00B2c. The inability to ambulate effectively means "an extreme limitation of the ability to walk." See Listing 1.00B2b.[2] The inability to perform fine and gross movement effectively means "an extreme loss of function of both upper extremities." See Listing 1.00B2c.[3]

Listing 1.04 encompasses disorders of the spine. Paragraph C of Listing 1.04 requires a showing of, inter alia, an inability to ambulate effectively as defined in Listing 1.00B2b.

---

[2]

Examples of ineffective ambulation include the inability to walk without assistive devices, the inability to walk a block at a reasonable pace on rough or uneven surfaces, and the inability to carry out routine ambulatory activities such as shopping and banking.

[3]

Examples of an inability to perform fine and gross movements effectively include the inability to prepare a simple meal and feed onself and the inability to place files in a cabinet at or above waist level.

The medical evidence relevant to Listings 1.02 and 1.04C reflect that Ogara had back surgery in either 2002 or 2003. See Transcript at 35, 222, 244. She testified during the administrative hearing that the surgery was performed to treat her tethered spinal cord. See Transcript at 35. She testified that she returned to work after the surgery. See Transcript at 36. She testified that she later developed sciatica, see Transcript at 36, but it is not clear from the record whether the pain caused by the sciatica was caused by, or related to, her back surgery.

In March of 2011, an MRI of Ogara's lumbar spine was performed. See Transcript at 222-223. Dr. Larry Johnson, M.D., reviewed the results and offered the following findings and conclusions:

> FINDINGS: There is no evidence of acute lumbar spine fracture. The alignment of the lumbar spine is grossly normal. There is degenerative disc disease and disc height loss noted at L4-L5. There is broad disc bulge noted at L4-L5. Prior surgical changes of the lower lumbar spine noted with a history of tethered cord. The conus medullaris terminates fairly normally in the approximate L1-L2 level. There is no significant canal or neuroforaminal stenosis present. There is no open neural tube defects identified.
>
> CONCLUSIONS: Degenerative changes of the lumbar spine. Prior back surgery changes with a history of tethered cord. If there is suspicion for mass or other problem other than trauma post contrast study would be provide slightly additional information but with the history of hit in the back with a door there is no evidence of acute fracture, no significant disc herniations or bulges and only postsurgical changes are noted from the tethered cord surgery.

See Transcript at 222.

Ogara was seen at the Lawrence Memorial Hospital on what appears to have been eight occasions between September of 2011 and January of 2012 for her complaints of, inter alia, back, hip, and leg pain. See Transcript at 238-242, 250-265. She was repeatedly observed to be ambulatory. See Transcript at 251, 255, 257, 261. An x-ray of her lumbar spine revealed "focal disc space narrowing at L4-5," see Transcript at 264, and an MRI of her lumbar spine revealed a mild disc bulge at L4/L5 but no stenosis, see Transcript at 262. An x-ray of her hips was negative. See Transcript at 265.

In January of 2012, an x-ray of Ogara's lumbar spine was taken at the St. Bernards Medical Center at the request of Dr. Veryl Hodges, D.O. See Transcript at 231-232. The results of the x-ray were consistent with the results of Ogara's earlier testing. Dr. Kenneth Tidwell, Jr., M.D., interpreted the results of the x-ray to be as follows: "Findings consistent with chronic degenerative disc disease at the L4-L5 level which demonstrates some disc space narrowing and hypertrophic spurring. No evidence of any obvious fractures of malalignment or other osseous disease appreciated." See Transcript at 231.

In January of 2012, Dr. Roger Troxel, M.D., ("Troxel") performed a general physical examination of Ogara at the request of the state agency. See Transcript at 244-248. He found, inter alia, that her range of motion in all of her extremities was within normal limits, although he did observe that a straight leg raise was positive at thirty-five degrees on her right side. He observed no muscle weakness, no muscle atrophy, and no abnormalities in her gait or coordination. He observed that she could hold a pen and

write, touch fingertips to palm, oppose thumb to fingers, pick up a coin, stand/walk without an assistive device, walk on heel and toes, and squat/arise from a squatting position. He also observed that she had a normal grip strength. Troxel appears to have reviewed the results of an MRI and diagnosed Ogara with lumbar spondylosis. He opined that she had a moderately decreased ability to lift and carry but no significantly decreased ability to walk, stand, sit, handle, finger, see, hear, or speak.

In February of 2012, Ogara was evaluated by Dr. John Campbell, M.D., ("Campbell") at the Jonesboro Neurosurgery Clinic for her complaints of back and right leg pain. See Transcript at 282-284. His examination revealed, in part, the following: "She is ambulatory independently. She generates 5/5 strength in both lower extremities. ... Straight leg raise testing is negative. ... She has somewhat reduced range of motion on the lumbar spine." See Transcript at 282. He reviewed the results of earlier testing and determined that she has "some degenerative changes in the L4-5 disks with bulging of the disks." See Transcript at 281-282. He did not recommend surgical intervention for her complaints; he only recommended physical therapy and home exercise.

Ogara thereafter received physical therapy from Five Rivers Therapy Services for what appears to have been an approximately three month period. See Transcript at 285-304. In a discharge report, a physical therapist noted the following: "[Patient] demonstrated independence with her [home exercise program] and improved [active range of motion] in all planes. However she reported no sustained change in pain level." See Transcript at 285.

In July of 2012, Ogara began seeing Dr. Sunil Gera, M.D., ("Gera") for pain management. See Transcript at 305-313. At what appears to have been an initial consultation, Gera diagnosed her with, inter alia, low back pain, lumbar spondylosis, and "facet arthropathy lumbar area." See Transcript at 313. He prescribed medication for her pain. On four separate occasions, he performed what he characterized as lumbar medial nerve branch blocks. See Transcript at 307, 308, 310, 311. It is unclear whether the treatments were of any value because Ogara characterized her pain after the last procedure as "ten plus" on a ten point pain scale. See Transcript at 305-306. In Gera's last progress note, he noted, though, that she was walking without assistance and likely drove herself to the examination. He wondered how a patient with such allegedly severe pain could do those activities.

In January of 2013, Ogara was seen at the Lawrence County Family Clinic for her complaints of a rapid heart beat and shortness of breath. See Transcript at 340-342. The progress note from the visit is unremarkable, save the attending medical professional's notation that Ogara left the visit "[a]mbulatory with [her] husband." See Transcript at 341.

At step three, the ALJ considered whether Ogara has an impairment, or combination of impairments, that meets or equals a listed impairment. The ALJ did so pursuant to several listings, two of which were Listings 1.02 and 1.04. The ALJ found that Ogara does not have an impairment, or combination impairments, meeting or equaling a listed impairment.

Substantial evidence on the record as a whole supports the ALJ's finding at step three. The Court so finds because Ogara has failed to produce medical evidence that her impairments meet or equal Listing 1.02 or Listing 1.04C. The medical evidence establishes that although Ogara has a mild disc bulge at L4/L5 and/or lumbar spondylosis, she does not have an inability to ambulate effectively. For instance, Troxel, Campbell, and Gera each observed that Ogara could ambulate without assistance. The medical evidence also establishes that her impairments do not cause an inability to perform fine and gross movements effectively. For instance, Troxel observed that Ogara has no significantly decreased ability to, inter alia, handle or finger.

Ogara offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Ogara maintains that her mental impairments meet or equal Listings 12.04 and 12.06, and the ALJ erred at step three when she failed to so find.

Listing 12.04 encompasses affective disorders. The required level of severity is met when the requirements of paragraphs A and B of Listing 12.04 are shown or when the requirements of paragraph C of Listing 12.04 are shown. Paragraph A requires proof of a depressive, manic, or bipolar syndrome. Paragraph B requires that the syndrome result in at least two of the following:

> (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.

Paragraph C requires a showing of a syndrome of at least two years' duration that has caused more than a minimal limitation of the ability to do basic work activities and one of the following:

> (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.06 encompasses anxiety-related disorders. The required level of severity is met when the requirements of paragraphs A and B of Listing 12.06 are shown or when the requirements of paragraphs A and C of Listing 12.06 are shown. Paragraph A requires proof of generalized persistent anxiety accompanied by at least three symptoms. Paragraph B is identical to paragraph B of Listing 12.04 and need not be repeated. Paragraph C of Listing 12.06 requires a showing of a "complete inability to function independently outside the area of one's home."

The medical evidence relevant to Listings 12.04 and 12.06 reflects that Ogara has experienced episodes of depression and/or anxiety. For instance, when she first saw Gera in July of 2012 for pain management, she appeared depressed. See Transcript at 313. He started her on an anti-depressant and appears to have re-filled it once. See Transcript at 309. His later progress notes, though, contain no mention of her complaints of depression and/or anxiety.

In September of 2012, Ogara presented to the Lawrence County Family Clinic complaining of anxiety. Dr. Clay Spencer, M.D., ("Spencer") recorded her complaints as follows:

> Patient presents with anxiety, generalized. She has suggestive symptoms but does not currently carry an official diagnosis of anxiety disorder. Her symptom complex includes fear of dying, feeling of impending doom, hyperventilation, insomnia, light-headedness, palpitations, increased perspiration, and shortness of breath. True panic attacks apparently do not occur. The frequency [of] symptoms is once every couple of months. There are no apparent triggers that increase the anxiety. She is not currently being treated for anxiety. She has had no prior treatment for anxiety. Over the last 2-3 years she has [had] episodes of anxiety, yesterday was the worse. She was at home and began feeling anxious, heart racing, short of breath, she was generally weak and shaky. These episodes have not ever been related to eating or certain foods, or relieved with food. Yesterday, it lasted about 8-9 hours, she finally began to feel better after taking a cold shower. She states her mood is depressed, she feels irritable, not sleeping well, decreased appetite ...

See Transcript at 328. Spencer assessed depression with anxiety and prescribed medication. After adjusting her medication at subsequent examinations, he observed that she was "doing better." See Transcript at 337. In January of 2013, he saw her for rapid heart beats and shortness of breath but attributed her symptoms to "paroxysmal supraventricular tachycardia." See Transcript at 341.

At step three, the ALJ considered whether Ogara's mental impairment, or combination of impairments, meet or equal Listing 12.04 but did not consider whether they meet or equal Listing 12.06. The ALJ found that Ogara does not have a mental impairment, or combination of impairments, meeting or equaling a listed impairment.

-9-

Substantial evidence on the record as a whole supports the ALJ's finding at step three. The ALJ could and did find that Ogara's mental impairments do not meet or equal Listing 12.04.The medical evidence establishes that although Ogara has experienced episodes of depression and/or anxiety, her symptoms do not satisfy the requirements of paragraph B of Listing 12.04. There is no medical evidence her mental impairments adversely impact her activities of daily living, see Transcript at 157-162, 177-182; adversely impact her social functioning, see Transcript at 161-162, 181-182; cause her difficulties in maintaining concentration, persistence, or pace, see Transcript at 162-163, 182-183; or have caused her to experience repeated episodes of decompensation. There is also no medical evidence her symptoms satisfy the requirements of paragraph C of Listing 12.04 as there is nothing to suggest that the symptoms cause more than a minimal limitation of her ability to do basic work activities.

It is true that the ALJ did not consider whether Ogara's mental impairments meet or equal Listing 12.06, but the ALJ's failure to do so does not warrant a remand. There is no medical evidence Ogara's mental impairments meet or equal paragraphs B or C of Listing 12.06.[4] See Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853 (8th Cir. 2003) (failure to consider listing not reversible error if record supports overall conclusion).

---

[4]

With respect to paragraph B of Listing 12.06, there is no medical evidence her mental impairments adversely impact her activities of daily living, see Transcript at 157-162, 177-182; adversely impact her social functioning, see Transcript at 161-162, 181-182; cause her difficulties in maintaining concentration, persistence, or pace, see Transcript at 162-163, 182-183; or have caused her to experience repeated episodes of decompensation. With respect to paragraph C of Listing 12.06, there is no medical evidence her mental impairments give rise to a "complete inability" to function independently outside the area of her home. See Transcript at 157-162, 177-182.

Ogara faults the ALJ for failing to prepare a psychiatric review technique. It appears that the ALJ did not prepare a psychiatric review technique, but her failure to do so does not warrant a remand. The failure to prepare a psychiatric review technique is reversible error unless there is no credible evidence the claimant has a severe mental impairment. See Cuthrell v. Astrue, 702 F.3d 1114 (8th Cir. 2013). In this instance, there is no credible evidence that Ogara has a severe mental impairment.

Given the foregoing, there is substantial evidence on the record as a whole to support the ALJ's findings. Ogara's complaint is therefore dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 3rd day of September, 2015.

_____
UNITED STATES MAGISTRATE JUDGE